In the Interest of: C.M., a minor child,

**Appeal of: G.A.M., Natural Father, Appellant**

In the Interest of: C.M., a minor child,

**Appeal of: J.K., Natural Mother, Appellant**

Superior Court of Pennsylvania.

Argued May 10, 2005.
Filed Aug. 22, 2005.

Michael Kolodziejczak, Lower Burrell, for G.A.M.

Charles F. Wade, Greensburg, for CYS.

Karen L. Kiefer, Scottdale, for J.K.

Richard A. Bruni, Lower Burrell, for C.M.

Richard A. Bruni, Lower Burrell, for C.M.

Before: MUSMANNO, TODD and BOWES, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 G.A.M. ("Father") and J.K. ("Mother"), the natural parents of the minor child, C.M., have both appealed from the Order retaining C.M. in the custody of Westmoreland County Children's Bureau ("WCCB"), and ordering that WCCB "shall pursue the goal of adoption by the current foster parents ...." *See* Trial Court Order, 9/17/04. We affirm.

¶ 2 C.M. was born on July 29, 2002. On July 31, 2002, he was placed in the custody of WCCB by an emergency Order of court. On August 30, 2002, the trial court filed an Order declaring C.M. a dependent child. In its Order, the trial court indicated that C.M. had tested positive for cocaine at the

time of his birth, and that Mother and Father had admitted to "a drug usage problem." Trial Court Order, 8/30/02. The trial court further noted that another child of Mother's had been the victim of physical abuse resulting in serious bodily injury in September 2000. Finally, the court ordered that efforts be made to reunify the family. *Id.*

¶ 3 On January 10, 2003, WCCB filed a Petition for a review hearing concerning C.M.'s placement. In the Petition, WCCB indicated that C.M. was residing in the home of the foster parents in Monessen, Pennsylvania. After a hearing, the trial court determined that Mother was continuing to use drugs and that Father was an "enabler" of Mother's drug addiction. Judicial Findings and Order of Court, 5/5/03. The trial court found that placement of C.M. was necessary and that the placement goal of reunification with the parents continued to be appropriate and feasible. *Id.* The trial court ordered that C.M. remain in the custody of WCCB "for placement in foster care." *Id.*

¶ 4 On June 11, 2003, WCCB filed a Petition for a placement review hearing. In this Petition, WCCB recommended a change of C.M.'s placement goal from reunification to adoption. The trial court appointed separate counsel for Mother and Father. On August 12, 2003, after a hearing, the trial court determined that Mother had been unsuccessful in her drug treatment program, and that Father continued to be an enabler of Mother's drug addiction. The trial court noted that an incident of domestic violence had occurred between Mother and Father on July 12, 2003. The trial court found that placement of C.M. continued to be "necessary and appropriate," and that "[t]he placement goal of return home with the parents and a concurrent goal of adoption is appropriate and feasible." Judicial Findings

and Order of Court, 8/12/03. The trial court stated that "efforts should continue to be made to reunify the child with both or one parent." *Id.*

¶ 5 On October 23, 2003, WCCB filed a Petition for a placement review hearing, and requested that a goal change of adoption "be issued." Petition for Permanency Placement Review Hearing, 10/23/03. This Petition was withdrawn. *See* Order of Court, 11/17/03. However, on January 23, 2004, WCCB filed another Petition for a placement review hearing. WCCB again requested that a goal change to adoption "be issued." Petition for Permanency Placement Review Hearing, 1/23/04. A hearing on this Petition was held on February 9, 2004. Subsequently, the trial court found that Mother had been unsuccessful in her drug treatment program since the last review hearing, and that Father continued to be an enabler of Mother's drug addiction. The trial court noted that Mother had moved out of the home in which she had lived with Father, but found this to be an attempt to influence the court. The trial court also found that Father failed to honor his word to the court that he would separate himself from Mother if she continued using drugs or failed to remain in treatment. *Id.*

¶ 6 The trial court further found that WCCB had made "reasonable efforts to finalize the permanency plan" for C.M., but had not "aggressively pursued" placement and adoption options with C.M.'s paternal great aunt and uncle, who had expressed an interest in adopting C.M. The trial court indicated that WCCB "shall now concentrate on investigating the feasibility and appropriateness of both adoptive families." *Id.* The trial court stated that the placement goal for C.M. was adoption, and ordered WCCB to "concurrently pursue adoption for both the current foster par-

ents as well as the paternal aunt and uncle . . . ." *Id.*

¶ 7 On July 14, 2004, WCCB filed a Petition for a placement review hearing. In this Petition, WCCB requested that C.M. be placed "in the most appropriate home for permanency and potential adoption." Petition for Permanency Placement Review Hearing, 7/14/04.

¶ 8 On July 27, 2004, the paternal great aunt and uncle (hereinafter "aunt and uncle") filed a Petition to intervene in the instant case, indicating that they desired to adopt C.M. The trial court denied the aunt and uncle's Petition.

¶ 9 The trial court conducted permanency review hearings on August 31, 2004 and September 1, 2004. The trial court heard testimony from Dr. John Carosso, a licensed psychologist called on behalf of WCCB, and Dr. Gerald Surmacz, an independent psychologist appointed by the trial court at Father's request, as well as other witnesses. On September 17, 2004, the trial court found that C.M. had developed a bond with the foster parents and was "thriving in their care." Judicial Findings and Order of Court, 9/17/04. Further, the trial court determined that C.M. would suffer "some level of trauma" if he was removed from the foster parents' care at this time, but found that it would be in C.M.'s best interests to continue to have ongoing contact with the aunt and uncle. *Id.* The trial court decided that the aunt and uncle's familial relationship with Father did not give them any preference over the foster parents as proposed adoptive parents, and in fact created a potential detriment to C.M. *Id.* The trial court ordered WCCB to pursue the goal of adoption by the foster parents, and ordered a permanency review hearing within six months. *Id.*

¶ 10 Both parents filed timely Notices of appeal from the trial court's September 17,

2004 Order. Father raises the following issue on appeal:

1. Whether the trial court erred and abused its discretion in failing to make the necessary findings on the numerous factors relative to [C.M.'s] best interests, but instead accepted as dispositive the importance of bonding, making only selective findings on the matter to support a psychological bonding presumption.

*See* Brief of Appellant (Father) at 13.

¶ 11 Mother's issues on appeal are as follows:

1. Whether the trial court's ruling to continue placement of C.M. in foster care was against the weight of the evidence, and therefore not in the child's best interests?

2. In determining the best permanent placement for C.M., whether the trial court erred in finding the foster parents and the aunt and uncle equal, when the aunt and uncle are better educated, engaged in stable employment, have no history of divorce, are active in church and community, had good childhoods, have substantial income, live in a lovely home with expansive yard in a nice town, are blood relatives of C.M., have visited with C.M. regularly and frequently, are strongly preferred by the natural parents and are approved as an adoptive couple, while the foster parents are less educated, had difficult childhoods, are both unemployed, have a history of divorce over several generations, have a low income level, live in Monessen, are not related to C.M., are not preferred by the natural parents (whose parental rights have not been terminated), have a dysfunctional extended family, wild daughters/step-daughters, grandchildren born out-of-wedlock and are approved only as foster parents?

3. Whether the trial court erred in failing to balance the potential short term trauma against potential long term gain to be had with the aunt and uncle and the foster parents?

4. Whether the trial court erred in relying on the conclusion of Dr. Carosso when such conclusion was wholly unsupported by Dr. Carosso's written report, and Dr. Carosso appeared strongly biased in favor of WCCB?

*See* Brief of Appellant (Mother), at 4. Before addressing these issues, we must first determine if this appeal is properly before us.

¶ 12 "A final order is an order which disposes of all claims and parties, is expressly defined as a final order, or is determined final by an administrative or lower court." *In the Interest of H.S.W.C.-B.*, 575 Pa. 473, 836 A.2d 908, 909 (2003) (citing Pa.R.A.P. 341(b)). "With a few designated exceptions, most other orders are interlocutory and subject to the discretion of the appellate court." *Id.* (citing Pa.R.A.P. 311).

¶ 13 The Pennsylvania Supreme Court, in *H.S.W.C.-B.*, 836 A.2d at 909, held that, in a dependency case, "[a]n order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered." *Id.* We must examine the facts of *H.S.W.C.-B.* to determine its applicability to the instant case.

¶ 14 In *H.S.W.C.-B.*, the trial court denied the petition of Children and Youth Services to have the minor dependent child's placement goal changed from reunification to adoption. *Id.* The Superior Court, relying on its prior decision in *In re J.S.*, 795 A.2d 985 (Pa.Super.2001), quashed the appeal on the basis that the order merely maintained the *status quo* and was therefore, not a final, appealable order. *H.S.W.C.-B.*, 836 A.2d at 909.

¶ 15 In *J.S.*, the order on appeal was entered after a permanency review hearing. *J.S.*, 795 A.2d at 985–86. J.S. was placed in a foster home at the time of the review hearing, with a stated placement goal of: placement with "a legal custodian or other living arrangement intended to be permanent in nature." *Id.* at 986. At the time of the review hearing, J.S. had been in foster home placement for over 37 months. After the hearing, the trial court in *J.S.* ordered the placement goal to remain the same, and J.S.'s mother appealed from that order. *Id.* at 986.

¶ 16 On appeal in *J.S.*, a panel of this Court held that the trial court's order was interlocutory and not appealable. *Id.* at 987. The Court acknowledged that, in general, "a change of placement goal is appealable." *Id.* However, the Court found "no authority for the proposition that an order which retains the *status quo* is appealable." *Id.* Thus, the Court in *J.S.* quashed the appeal. *Id.*

¶ 17 In *H.S.W.C.-B.*, the Pennsylvania Supreme Court criticized the Superior Court's holding in *J.S.*, stating that, "[i]n practice, ... orders that are not status-changing have been regularly reviewed not only by the Superior Court, but also by this Court." *H.S.W.C.-B.*, 836 A.2d at 910. The Court in *H.S.W.C.-B.* reasoned as follows:

> Maintaining the *status quo* could put the needs and welfare of the child at risk.... [T]he denial of goal changes which are in the best interest of the child should not be sheltered, permanently, from independent review.... If a trial judge erroneously denies these motions and improperly maintains the *status quo*, and keeps doing that on periodic review, such an improper order will *never* be subject to appellate review.

*Id.* at 910 (citations omitted) (emphasis in original).

¶ 18 The Court in *H.S.W.C.-B.* then noted that orders "dealing with custody or visitation," with certain exceptions, are "final when entered." *Id.* at 911 (citation omitted). The Court opined that, if such orders are final when entered, "the denial of a proposed goal change or petition for termination of parental rights should logically be deemed final as well." *Id.* The Court thus held that "[a]n order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered." *Id.*

¶ 19 *H.S.W.C.-B.* clearly holds that an order granting or denying a goal change request, in a case involving a dependent child, is an appealable order. Thus, we must determine whether the Order on appeal in the instant case was an order denying or granting a goal change.

¶ 20 In this case, the Order changing C.M.'s placement goal from reunification to adoption was entered on February 17, 2004. However, Mother and Father did not appeal that Order. Rather, they appealed the subsequent Order of the trial court, in which the trial court directed WCCB to pursue the goal of adoption of C.M. by the foster parents.

¶ 21 Although the September 17, 2004 Order did not consist of a grant or denial of a proposed change in placement goal, as did the order in *H.S.W.C.-B.*, the September 17, 2004 Order involved a change in C.M.'s placement status, in that it determined which of two potential adoptive homes would be selected for C.M.'s permanent placement. This is the type of order, discussed by the Court in *H.S.W.C.-B.*, which "could put the needs and welfare of the child at risk" if it were not reviewable on appeal. *See H.S.W.C.-B.*, 836 A.2d at 910. Accordingly, we conclude that the trial court's September 17, 2004 Order is properly before this Court on appeal.

¶ 22 We now turn to the merits of this appeal. Father argues that the trial court erred and abused its discretion in failing to make necessary findings on numerous factors relevant to C.M.'s best interests, and instead accepted as dispositive the importance of psychological bonding.

¶ 23 Our scope and standard of review in dependency cases is as follows:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re C.M.T.*, 861 A.2d 348, 351 (Pa.Super.2004).

¶ 24 In cases involving the placement of a dependent child, "the question of bonding should not be the only or the deciding factor." *In re Desiree B.*, 304 Pa.Super. 461, 450 A.2d 1003, 1007 (1982). Psychiatric considerations, such as bonding, are important, but must not be made determinative, as the court in a dependency case must take many factors into ac-

count. *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635, 644 (1984).

¶ 25 In the instant case, the trial court indicated that it did not rely solely on the factor of bonding, but took other considerations into account. *See* Trial Court Opinion, 11/23/04, at 6. The record reveals that, in addition to the testimony of Drs. Carosso and Surmacz, the trial court heard testimony from Carrie Hopwood, a licensed social worker with the West Virginia Department of Health and Human Services, who evaluated the suitability of the aunt and uncle as adoptive parents; Carol Hott, of Parsons, West Virginia, who testified as to the aunt and uncle's reputation in the community and her personal observations of the aunt and uncle with C.M.; Tricia Ritson, a caseworker for WCCB; and the foster mother and the aunt. *See* N.T., 9/1/04.

¶ 26 The trial court acknowledged that the opinions of Drs. Carosso and Surmacz on the issue of psychological bonding were "one of the substantial *deciding* factors." Trial Court Opinion, 11/23/04, at 6 (emphasis in original). However, the trial court indicated that it considered "all applicable testimony ...." *Id.* The trial court then indicated that the foster parents "have had experience raising children as they have both served as foster parents for approximately five different children over the years." *Id.* The trial court further stated that the aunt and uncle both work full-time, while the foster father is retired, and the foster mother is not employed. *Id.* at 7. The trial court found this to be an advantage to C.M. "to have two parents who are willing to devote their attentions to him full-time." *Id.*

¶ 27 It is clear from the trial court's Opinion that, in addition to the factor of C.M.'s psychological bond with the foster parents and the possibility of trauma if he were removed from their care, the trial court also relied on other factors. Specifically, the trial court indicated that it relied on the fact that the foster parents have had experience in raising children, and the foster parents are available to care for C.M. on a full-time basis. Thus, we are not persuaded by Father's argument that the trial court relied exclusively on the factor of psychological bonding.

¶ 28 Father also contends that WCCB failed to investigate the aunt and uncle as a permanent placement alternative, and that this delay caused the bond between C.M. and the foster parents to develop. Father asserts that WCCB employed delaying tactics to facilitate the placement of C.M. with the foster parents.

¶ 29 In addressing this issue, the trial court stated that its primary consideration was the best interests of C.M., and that WCCB's investigation procedures had "no bearing on C.M.'s best interests." Trial Court Opinion, 11/23/04, at 7. The trial court also indicated that it found the testimony of the WCCB caseworker, Ritson, to be credible evidence of the good faith of WCCB with regard to C.M.'s placement with the foster parents.

¶ 30 Ritson testified that the aunt had expressed an interest in C.M. in June 2003, and had stated that if C.M. could not be returned to the parents, she would be interested in having C.M. placed with her. N.T., 9/1/04, at 198, 201. Ritson further indicated that, in November 2003, on the date of a scheduled permanency review hearing, the aunt told Ritson that she would like to be considered as a placement alternative for C.M. *Id.* at 203. Ritson stated that she sent for information that day concerning a home study of the aunt and uncle, but did not receive it. *Id.* Ritson did not actively pursue the information in late 2003 due to more pressing matters in her job at WCCB. *Id.* at 203–04. How-

ever, Ritson began to actively pursue placement with the aunt and uncle in January and February 2004. *Id.* at 204. In May 2004, after receiving the results of a home study of the aunt and uncle, WCCB approved weekend home visits for C.M. with them. *Id.*

¶ 31 Based on Ritson's testimony, the trial court determined that WCCB acted in good faith in investigating the potential placement of C.M. with the aunt and uncle. Trial Court Opinion, at 8. We conclude that Ritson's testimony supports this determination. In addition, although Father asserts that, between July 31, 2002 and June 23, 2003, the aunt and uncle "stood ready" to be a "placement alternative for C.M.," *see* Brief of Appellant (Father) at 16, Ritson testified that the parents initially rejected the aunt and uncle as an alternative placement option, and preferred the foster parents because the foster parents resided in closer proximity to the parents, thus allowing them more frequent visitation with C.M. *See* N.T., 9/1/04, at 200–01. Thus, we conclude that the evidence does not support Father's claim that WCCB acted in bad faith, or intentionally delayed consideration of the aunt and uncle as an alternative placement option.

¶ 32 Father also asserts that the trial court failed to make any findings or analysis of the evidence, "independent of the psychological experts [Drs. Carosso and Surmacz] regarding the fitness and psychological make-up of the ... Foster Mother ...." Brief of Appellant (Father), at 24–25. Our review of the record reveals that Drs. Carosso and Surmacz thoroughly explained their reasons for favoring the placement of C.M. with the foster parents. The trial court indicated that it "accepted the opinions of Drs. Carosso and Surmacz as being factually based and credible." Trial Court Opinion, at 6. The trial court also provided its reasons for deciding that

C.M. should be placed with the foster parents. We conclude that the trial court was not required to make any additional analysis of the evidence on this particular point.

¶ 33 Father also contends that various facts upon which Dr. Carosso relied were "either incorrect or had been rendered non-existent." *See* Brief of Appellant (Father), at 27–29. Father did not raise these facts specifically in his Rule 1925(b) statement. Therefore, Father's arguments challenging the specific facts upon which Dr. Carosso relied are waived. *See Riley v. Foley,* 783 A.2d 807, 813 n. 6 (Pa.Super.2001) (finding waiver in child support case for failure to include issue in Rule 1925(b) statement and stating that the holding of *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 308 (1999) applies in family law cases); *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 658 (Pa.Super.2000) (holding that failure to include an issue in a Rule 1925(b) statement waives that issue for purposes of appellate review).

¶ 34 In addition, we note that Father has not given correct citations to the record as to where these alleged errors occurred, thus impeding our review. Nevertheless, we have reviewed the record, and conclude that the issues raised by Father concerning Dr. Carosso's testimony are not persuasive and would not preclude the trial court from finding Dr. Carosso to be a credible witness.

¶ 35 We now consider Mother's issues on appeal, using the same standard of review as previously set forth. *See In re C.M.T.,* 861 A.2d at 351.

¶ 36 Mother first argues that the trial court's September 17, 2004 Order, which continued C.M. in foster care and designated the foster parents as the adoptive parents for C.M., was against the weight of the evidence. Mother alleges

that, at the time of the permanency placement hearing of August 31, 2004, only the aunt and uncle's home had been approved for adoption. Further, Mother asserts that she and Father had agreed to consent to C.M.'s adoption by the aunt and uncle; thus, the designation of the foster parents as the adoptive parents will delay C.M.'s permanent placement because WCCB will have to file petitions for involuntary termination of parental rights.

¶ 37 While Mother may be correct in her argument that WCCB will have to file petitions to involuntary terminate parental rights, we conclude that the trial court correctly focused on other factors in determining C.M.'s best interests. The fact that WCCB may have to file petitions to involuntarily terminate the parents' rights will not affect C.M.'s daily care, as he is currently placed in his designated future adoptive home.

¶ 38 Along the same lines, Mother cites the testimony of Carrie Hopwood, a licensed social worker for the West Virginia Department of Health and Human Services. Ms. Hopwood prepared a report and testified that the aunt and uncle were approved by her department as adoptive parents for C.M. Mother asserts that the trial court erred by failing to acknowledge Ms. Hopwood's report or testimony and also failed to acknowledge that the aunt and uncle were the only approved adoptive home at the time of the August 31, 2004 hearing.

¶ 39 While the trial court did not specifically discuss Ms. Hopwood's testimony in its Opinion, we cannot agree that the trial court failed to consider Ms. Hopwood's testimony and report. The trial court indicated in its Opinion that it did not base its decision solely on the expert opinions of Dr. Carosso and Dr. Sumacz concerning bonding, but took other factors into consideration, and came to its decision "[a]fter

hearing all applicable testimony in the case ...." *See* Trial Court Opinion, 11/18/04, at 6.

¶ 40 Mother next asserts that the aunt's testimony shows that the trial court's decision was against the weight of the evidence. Mother contends that any trauma that C.M. might experience in being adopted by the aunt and uncle could be handled effectively by the aunt, with the assistance of professionals if necessary, given the aunt's experience of working with children of all ages for many years.

¶ 41 In addressing this contention, we note that the trial court determined that the risk of trauma to C.M. may only be slight, but it was unnecessary to undertake such a risk, since C.M. is "flourishing in his current placement setting." Trial Court Opinion, 11/18/04, at 7. The trial court clearly was seeking to further C.M.'s best interests by its decision, and we find no abuse of discretion by the trial court in deciding to forego the risk of trauma to C.M. by a change in his present placement.

¶ 42 Mother asserts that Dr. Surmacz, the court-appointed psychologist, was neutral in his findings. She argues that Dr. Surmacz testified that both the aunt and uncle and the foster parents would make good parents, and that there was nothing that would disqualify either of the couples. Mother argues that, despite Dr. Surmacz's neutral testimony, the trial court erroneously found that Dr. Surmacz had a slight preference for the foster parents as a result of their greater demonstrations of affection toward C.M.

¶ 43 Our review of Dr. Surmacz's testimony indicates that he in fact stated that the foster parents were more affectionate and more attentive to C.M. than the aunt and uncle. *See* N.T., 9/1/04, at 117. Thus, we do not accept Mother's argument with regard to Dr. Surmacz.

¶ 44 Mother next reviews the testimony of Ms. Carol Hott, a resident of Parsons, West Virginia, who has known the aunt and uncle for over twenty-eight years. Ms. Hott testified favorably for the aunt and uncle based on Ms. Hott's observations of the aunt and uncle with C.M. Mother argues that, based on Ms. Hott's testimony, the trial court should have found that a bond had developed between C.M. and the aunt and uncle, and that C.M. would be safe in a placement with them.

¶ 45 In this regard, the trial court noted that Dr. Carosso, whose testimony the trial court found credible, testified that a bond existed between C.M. and both the aunt and uncle and the foster parents. *See* Trial Court Opinion, 11/18/04, at 3. In addition, the trial court found that the aunt and uncle, as well as the foster parents, "would provide a loving and caring atmosphere within which the child could be raised." *Id.* at 6. Thus, the trial court's findings were consistent with what Mother contends should have been deduced from Ms. Hott's testimony.

¶ 46 Mother contends that the foster mother's testimony demonstrates that the foster mother "is dependent on C.M., almost desperate, for her sense of self-worth and/or self fulfillment, [while] [the aunt] offers C.M. a value system, a stable, secure home, and a sense of family." Brief of Appellant (Mother) at 27.

¶ 47 Our review of the record reveals no support for Mother's argument regarding the foster mother. Neither of the experts who evaluated the foster parents made findings or conclusions that would support Mother's argument regarding the foster mother.

¶ 48 Mother next argues that the trial court erred in finding both the aunt and uncle and the foster parents to be equal "when [the aunt and uncle are] better educated, engaged in stable employment, [have] no history of divorce," *etc.*, while "[the foster parents are] less educated, both unemployed, have a history of divorce," *etc.* *See* Brief of Appellant (Mother) at 30.

¶ 49 In a dependency proceeding, we accord great weight to the trial judge's credibility determinations because the trial judge is in the best position to observe the witnesses and evaluate their credibility. *In re S.B.*, 833 A.2d 1116, 1117 (Pa.Super.2003). In this case, the trial court heard testimony from the foster mother, the aunt, and the two psychologists who evaluated both couples. The psychologists found both couples to possess the necessary attributes to provide a proper home for C.M. The trial judge was in the best position to evaluate the credibility of all of these witnesses. We accord great weight to the trial judge's credibility determinations and find no merit to Mother's argument.

¶ 50 Mother next asserts that the trial court failed to balance the potential short term trauma of removing C.M. from the foster home with the potential long-term gain to be had with the aunt and uncle. *See* Brief of Appellant (Mother) at 36–38. This argument is essentially a reiteration of Mother's previous argument that the aunt and uncle and the foster parents are not equal in terms of their ability to be parents to C.M., and that the foster parents are inferior due to various factors. As we previously indicated, we consider this argument to be essentially one involving the credibility of the witnesses before the trial court. We accord great weight to the trial court's credibility determination, and our review does not convince us that the trial court abused its discretion in its decision. Thus, we find no merit to Mother's argument in this regard.

¶ 51 Mother next argues that the trial court erred in relying on Dr. Carosso's conclusions. Mother asserts that Dr. Carosso's conclusions were unsupported by his written report, and that his conclusions were offered contrary to the standards of his profession. Mother challenges Dr. Carosso's conclusion that the foster parents have certain advantages over the aunt and uncle, including their history of raising children. Mother then sets forth the same argument that she has previously raised concerning the foster parent's family members, *i.e.*, that the foster parents' family is dysfunctional. *See* Brief of Appellant (Mother) at 40. Mother asserts that there is no evidence that the foster parents have ever successfully raised a child. *Id.* She notes that she challenged Dr. Carosso with these arguments during cross-examination. *Id.* at 42. Indeed, our review of the record demonstrates that Mother conducted a vigorous cross-examination of Dr. Carosso. Mother also challenges other conclusions made by Dr. Carosso, and contends that he was not a credible witness.

¶ 52 As previously stated, we give great weight to the trial court's determinations of credibility. *In re S.B.*, 833 A.2d at 1117. In addition, our review of the record convinces us, contrary to Mother's argument, that Dr. Carosso's testimony demonstrates that he reached his conclusions properly. Accordingly, we find Mother's argument in this regard unpersuasive.

¶ 53 For the above reasons, we affirm the trial court's Order of September 17, 2004.

¶ 54 Order affirmed.