J-A04046-23

2023 PA SUPER 35

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.P., FATHER | : | |
| | : | No. 1753 MDA 2022 |

Appeal from the Order Entered December 13, 2022
In the Court of Common Pleas of Dauphin County
Orphans' Court at No: 149 OC 2022

BEFORE: STABILE, J., DUBOW, J. AND MCCAFFERY, J.

OPINION BY STABILE, J.: **FILED: MARCH 6, 2023**

Appellant, L.P. ("Father"), appeals from the December 13, 2022 order entered in the Court of Common Pleas of Dauphin County ("trial court"). The order, which was modified by order entered January 3, 2023, granted the emergency petition filed by Appellee, The Milton S. Hershey Medical Center ("Medical Center"), and authorized the Medical Center "to perform a confirmatory brain death evaluation" on Father's four-year-old daughter, M.A.P., "and on determination that the child is deceased, with discussion of the family, to discontinue ongoing medical care in accordance with the accepted medical standards." Modified Order, 1/3/23, at 1. Father contends the court erred and abused its discretion because its order failed to align with statements made from the bench during the December 13, 2022 hearing on the petition. Specifically, Father contends the court represented that only the

question of conducting the brain-death evaluation was at issue, not the discontinuance of medical care, and that the court's order "blatantly contradicted" that representation. Appellant's Brief at 15. Following careful and considered review, we affirm in part and vacate in part.

In its Rule 1925(a) opinion, the trial court provided a detailed history of the case, incorporating the factual and medical background as presented in the Medical Center's emergency petition ("the Petition"). **See** Rule 1925(a) Opinion, 1/11/23, at 1-4. As reflected in that summary, four-year-old M.A.P. was transferred to the Medical Center from Chambersburg Hospital on November 6, 2022, due to her decreased responsiveness secondary to a respiratory illness and fever. She had previously been seen at an urgent care facility where she reportedly tested negative for COVID-19, respiratory syncytial virus ("RSV"), and influenza.

While awaiting transfer to the Medical Center, M.A.P. suffered respiratory problems, decreased responsiveness, and cardiac arrest requiring multiple rounds of CPR. Lab results demonstrated profound anemia.[1] Upon transfer to the Medical Center, she was admitted to the pediatric intensive care unit ("PICU") and developed a second cardiac arrest requiring multiple rounds of CPR and resuscitative medications. As a result of the multiple

---

[1] Anemia is a condition in which a person lacks enough healthy red blood cells to carry adequate oxygen to the body's tissues. **See** *https://www.mayoclinic.org/diseases-conditions/anemia/symptoms-causes/syc-20351360*.

- 2 -

cardiac arrests and decreased blood flow and oxygenation, M.A.P. developed hypoxic brain injury.

A PICU team assessment performed on the evening of November 8, 2022, in the presence of family, did not elicit any response. The Medical Center's pediatric neurology physicians performed a "cessation of brain function" exam the following day, on November 9, 2022, and determined the absence of brain function. The Medical Center avers that M.A.P.'s brain injury is permanent, global, severe, and irreversible and notes she has not shown any neurological improvements since her admission to the Medical Center.

Following the November 9, 2022 cessation of brain function exam, the Medical Center engaged in discussions with Father and Mother regarding M.A.P.'s grave condition and potential brain death. Subsequently, on December 1, 2022, pediatric intensive care physician Theodore DeMartini, M.D. ("Dr. DeMartini"), conducted the first of two brain death evaluations required by accepted medical guidelines to identify the child as deceased.[2] Father was present for the examination and the results were shared with him. Subsequent examinations demonstrated M.A.P.'s ongoing lack of neurological function.

---

[2] **See** Medical Center Petition, Exhibit A (American Academy of Pediatrics' "Clinical Report—Guidelines for the Determination of Brain Death in Infants and Children: An Update of the 1987 Task Force Recommendations," *Pediatrics*, Vol. 128, No. 3, at e720-e740 (September 2011)).

On December 9, 2022, the Medical Center filed the Petition seeking court authorization to conduct a second brain death evaluation, in accordance with the accepted medical standards. The Medical Center represented that Mother agreed with the performance of a second brain death evaluation to confirm the child's death. However, Father opposed performance of the evaluation "because he is opposed to the cessation of any medical interventions for the child, regardless of the likelihood that [the evaluation will demonstrate that M.A.P. meets criteria for brain death.]"[3] Emergency Petition, 12/9/22, at ¶¶ 34, 35.

In light of the disagreement between M.A.P.'s parents regarding the child's treatment, the Medical Center averred the child was a dependent child as defined by the Juvenile Act, 42 Pa.C.S.A. § 6302. The Medical Center requested that the trial court enter an order, in accordance with 42 Pa.C.S.A. § 6339(b), authorizing the Medical Center to conduct the "confirmatory brain

_____

[3] Pennsylvania has adopted the Uniform Determination of Death Act ("UDDA"), 35 P.S. §§ 10201-10203. Section 10203 provides:

Only an individual who has sustained either:
(1) irreversible cessation of circulatory and respiratory functions; or
(2) **irreversible cessation of all functions of the entire brain, including the brain stem** is dead.
**A determination of death must be made in accordance with accepted medical standards.**

35 P.S. § 10203 (emphasis added).

death evaluation and, assuming M.A.P. meets brain death criteria, termination of ongoing medical care." *Id.* at ¶¶ 41-44. The Medical Center represented that the child's parents were notified of the presentation of the petition to the court. *Id.* at ¶ 45.

The trial court entered two orders on December 9, 2022, the first setting December 13, 2022 as the date for an emergency hearing on the Petition and the second declaring M.A.P. dependent[4] in accordance with the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.,* and appointing a Guardian *ad litem* ("GAL") to M.A.P. The second order also directed that the GAL have unobstructed access to visit M.A.P. and to discuss her care and condition with medical personnel. Rule 1925(a) Opinion, 1/11/23, at 4.

The court conducted an emergency hearing on the Petition on December 13. Mother did not appear for the hearing. Father appeared without counsel. At the hearing, Dr. DeMartini detailed his credentials and summarized the treatment provided to M.A.P. at the Medical Center, including his own role as attending physician for M.A.P. in the PICU from November 30 through December 6, 2022. He described in detail the "brain death exam" that he conducted on December 1, 2022, "based upon M.A.P.'s daily needs, the occurrence of the cardiac arrests, and the likelihood that M.A.P. had suffered brain injury." *Id.* at 6 (citing Notes of Testimony, Emergency Hearing

---

[4] No challenge has been made to the Medical Center invoking the Juvenile Act or the court declaring M.A.P. dependent.

("N.T."), 12/13/22, at 8-11). "It was concluded that the physical examination and apnea test were consistent with brain death." *Id.* (citing N.T., 12/13/22, at 11).

Both Mother and Father were present for the December 1 exam. Dr. DeMartini explained to Mother and Father each aspect of the exam and the apnea test as he conducted them and advised them that if the findings of the exam and the apnea test were consistent with brain death, the next step would be "to conduct a confirmatory neurological examination and an apnea test. If those were consistent with brain death, the mechanical-respiratory support would be removed." *Id.* at 6-7 (citing N.T., 12/13/22, at 11-12). As noted above, Mother was in agreement with conducting the confirmatory exam and removing mechanical-respiratory support. *Id.* (citing N.T., 12/13/22, at 12). According to Dr. DeMartini, Father did not agree, telling Dr. DeMartini that "we would not be doing another exam and would not be removing the port." N.T., 12/13/22, at 12.

In response to questions from the GAL, Dr. DeMartini explained that M.A.P. has a breathing tube connected to a ventilator, accounting for the heart beating and visible rising and falling of her chest. However, during the apnea test, when M.A.P. was removed from the breathing machine and observed for any chest movement, she "did not have any of the chest movement. . . . she did not breathe at all and she would not breathe at any point, no matter how

long we left her off." *Id.* at 8 (quoting N.T., 12/13/22, at 18-19) (misspelling corrected).

The court also permitted Father to question Dr. DeMartini, limiting the questions to the testimony presented by Dr. DeMartini, **"[n]othing on the outside of that,"** and directing Father that **"this hearing pertains to whether or not a second examination can be given, not to removing the child from the machine, and so I wanted to make that very clear."** N.T., 12/13/22, at 20 (emphasis added). When counsel for the Medical Center commented that Father's questioning was straying from the court's directive that the questions be limited to whether or not to perform a confirmatory test, the court responded, "I thought I made that clear, but I was giving him some leeway." *Id.* at 28.

Following the testimony of Dr. DeMartini, the court asked the GAL to share her thoughts. She voiced her understanding of Father's position and his apparent belief that M.A.P. would recover and indicated, having observed M.A.P., she could appreciate his thinking "because to my eyes, and I'm assuming to [Father's] eyes, it looks like his daughter is still alive because she does have breathing tubes, and it shows her breath moving up and down - - her chest is moving up and down." *Id.* at 37. She added:

> So I understand to look at this, it really can give a family or a person hope that their child is still alive and would continue to be alive if we had a little more time to be able to show that. However, based upon both my interview with [M.A.P.'s physician], which I had an opportunity to do in-person at the hospital, my personal observation of the child, as well as the testimony and evidence

presented here today, and within the petition, to me it is my opinion that all the necessary steps have been taken in this particular case by the doctors when they performed the brain death evaluation, which was consistent with her having brain death thus necessitating the need for a second brain death evaluation so as not to further continuously have his child laying in the hospital.

And I know that is very difficult, I cannot imagine what [Father] or the child's mom might be feeling or going through, but that is my recommendation for the court.

*Id.* at 37-38.

As the court prepared to announce its decision, Father stood and stated that he heard everything that was said about M.A.P. and her condition, and added, "It's like nobody talks about any of the progress she's made. They only talk about her brain. And that's what we're here for, to talk about her brain." *Id.* at 40.

The court responded:

**No. We're here to decide whether or not that second exam should be given. And then there's a step after that - - I suppose there might be a step after that as to whether or not the child should be removed or not.**

**But we're here to - - I wanted to listen to what was being told to me so that I could make a decision to grant the request to have the second exam. This isn't a decision to remove her from the ventilator. This is a decision to have the second exam. And I would think, if what you're saying is that she - - you believe she is breathing, that second exam should show that.**

*Id.* at 40-41 (emphasis added).

The court then issued its order, stating on the record:

> [W]e believe, based on all the evidence, that this 13th day of December 2022, it's proper, and the court hereby authorizes, physicians and the staff of Milton S. Hershey Medical Center to perform a confirmatory brain-death evaluation with regard to M.A.P., and on determination that the child is deceased, with discussion of the family, **to discontinue ongoing medical care in accordance with the accepted medical standards.**

*Id.* at 42 (emphasis added).

In other words, while the trial court insisted that the scope of the hearing was limited to conducting the confirmatory test, the court issued an order that addressed the second step, withdrawing life support, without allowing Father to address that second step, "as to whether or not the child should be removed or not." *Id.* at 41. As noted below, the court's written December 13, 2022 order mirrored its pronouncement from the bench, with the exception of eliminating the language "with discussion of the family." That language was added in the modified order entered on January 3, 2023.

On December 21, 2022, Father filed a timely, counseled appeal and an application to stay. By order entered the same day, the trial court denied the application to stay on procedural grounds. *See* Order, 12/21/22.

The following day, Father filed an amended emergency application for stay, seeking "an Emergency Order directing the continuance of ongoing medical care for [M.A.P.] until the appeal is heard." Father's Amended Emergency Application, 12/22/22, at ¶ 11. On the same day, the Medical Center filed a motion requesting, *inter alia*, the immediate filing of a Rule 1925(b) statement. Medical Center Motion, 12/22/22, at 3.

The trial court disposed of both parties' filings in a single order entered the same day. ***See*** Order, 12/22/22. The order provides:

> And now, this 22nd day of December, 2022, upon consideration of the Motion to . . . Require Immediate Filing of Statement of Errors Complained of on Appeal and **Stay this matter until further Order of Court**, it is ORDERED that the Motion is GRANTED.

Order, 12/22/22, at 1 (emphasis added). The order continues, directing Father to file his Rule 1925(b) statement by December 27, 2022, and further directing the Medical Center to file an answer to the Rule 1925(b) statement[5] by December 30, 2022. ***Id.***[6] There is no further mention of the emergency application to stay or the relief granted, which provides for a stay "until further Order of Court." ***Id.***

On December 27, 2022, Father filed his statement of errors complained of on appeal, asserting three errors. Rule 1925(b) Statement, 12/27/22, at ¶¶ 1-3. In Paragraph 2, Father complained that the trial court's order "failed to align with the verbal ruling that there would be discussion with the family prior to discontinuing ongoing medical care of [M.A.P.]." ***Id.*** at ¶ 2. In

---

[5] Pa.R.A.P. 1925(b)(4) provides that "[t]he judge shall not require any party to file a . . . response as part of or in conjunction with the Statement."

[6] The Medical Center's December 22, 2022 motion also requested designation of this case as a Family Fast Track case. Although the trial court ordered that designation, this Court entered an order on January 4, 2023, indicating that "this appeal does not meet the definition of a Children's Fast Track case pursuant to Pa.R.A.P. 102[.]" Order, 1/4/23. Designation of the appeal as a Children's Fast Track was removed.

response, on January 3, 2023, the court issued a modified order that included the phrase "with discussion of the family." Modified Order, 1/3/23, at 1.

In light of the modification, the Medical Center filed a Motion to Dismiss this appeal as moot, claiming there were no remaining issues for this Court to decide. The GAL filed a response, agreeing with the Medical Center. Father filed a response, contending the order still failed to align with the court's December 13, 2022 ruling.

By order entered January 18, 2023, this panel denied the motion to dismiss. In the interim, we issued an order setting an abbreviated filing schedule for all parties to file initial briefs by January 20, 2023 and response briefs by January 27, 2023. All initial briefs were filed as directed. The GAL filed a response brief in accordance with the order. Father and the Medical Center elected not to file response briefs. The parties appeared for argument on February 14, 2023.[7]

Father presents three issues for this Court's consideration:

A. Whether the lower court erred as a matter of law and abused its discretion when its December 13, 2022 written order failed to align with the verbal ruling that the December 13, 2022 hearing regarding the above-referenced child was to determine whether a confirmatory brain-death evaluation exam would be given, not whether she would be removed from the ventilator?

---

[7] On the day before scheduled argument, counsel for Father filed a motion for continuance, indicating she had tested positive for the coronavirus and could not attend the argument. Counsel for Father and the remaining parties agreed that Father would rely on the brief filed with the Court while the remaining parties would appear for argument. Therefore, we deny Appellant's Motion for Continuance as MOOT.

- 11 -

     B. Whether the lower court erred as a matter of law and abused its discretion when it's [*sic*] December 13, 2022 written order failed to align with the verbal ruling that there would be discussion with the family to discontinue ongoing medical care of the above-referenced child?

     C. Whether the December 13, 2022 order should be vacated as there is a fatal defect on the face of the record as the written order is not consistent with the order that was dictated by the judge at the hearing?

Father's Brief at 7.

As this Court has recognized, "We review the juvenile court's order for an abuse of discretion. As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law." *In Interest of A.W.*, 187 A.3d 247, 250 (Pa. Super. 2018) (citing *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010)). "[W]e must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate." *In re W.H.*, 25 A.3d 330, 336 (Pa. Super. 2011) (quoting *In re F.B.*, 927 A.2d 268, 272 (Pa. Super. 2007) (additional citations omitted)).

"Our scope of review . . . is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re F.B.*, 927 A.2d at 272 (quoting *In the Interest of C.M.*, 882 A.2d 507, 513 (Pa. Super. 2005)).

Although Father identifies three issues for our review, he concedes that his second issue is moot. Father's Brief at 15-16. In that second issue, Father argued that the court's written order did not align with its verbal ruling because it did not call for "with discussion of the family." This matter was resolved by the court's modified order entered January 3, 2023, which added the phrase, "with discussion of the family." *See* Modified Order, 1/3/23, at 1.

In his third issue, Father suggests there is a fatal defect on the face of the record. Father's contention lacks merit. The order as modified on January 3, 2023, is consistent with the order as spoken from the bench at the conclusion of the December 13, 2022 hearing. There is no defect, fatal or otherwise, in that order. Therefore, we shall limit our discussion to his first issue.

In his first issue, Father asserts that the trial court erred and abused its discretion because the court's order did not align with its "verbal ruling" that the hearing "was to determine whether a confirmatory brain-death evaluation exam would be given, not whether she would be removed from the ventilator." Father's Brief at 13. As reflected in the excerpt from the December 13, 2022 hearing quoted above, the court acknowledged there "might be a step" after a second exam, but reaffirmed that the court was making only "a decision to have the second exam." N.T., 12/13/22, at 41. "This isn't a decision to remove her from the ventilator." *Id.*

Despite the trial court's suggestion to the contrary, the court authorized discontinuance of ongoing medical care in the event of a confirmation of brain death, without giving Father an opportunity to ask any questions or present any argument relating to that "second step" of discontinuing life support. Although the court insisted that the second step was not before the court, the court's order authorized the Medical Center to discontinue ongoing medical care "on determination that the child is deceased, with discussion of the family." Trial Court Modified Order, 1/3/23. It is not clear whether discussion with the family requires consent to remove life support or whether discussion with family is merely to inform them of the decision to terminate life support. We note in any event that the Medical Center has stated in its brief that if the second test confirms brain death, it will discontinue life support. Medical Center's Brief at 30.

With respect to M.A.P., as of this time, only one brain death examination has been conducted, so no determination of death has been made in accordance with accepted medical standards, *i.e.*, the guidelines set forth in the American Academy of Pediatrics' Clinical Report. **See** n. 2, **supra**. Therefore, there is no basis upon which M.A.P. can be declared dead at this time or have her mechanical-respiratory support removed. Moreover, as previously noted, the trial court's December 22, 2022 order directed, *inter alia*, that the emergency stay with respect to ongoing medical care remain in effect until further order of court. However, Section 6339(b) of the Juvenile

- 14 -

Act does authorize the trial court, during the pendency of any proceedings, to order that a child be examined by a physician. 42 Pa.C.S.A. § 6339(b). Further, the court may order medical treatment of a child suffering from a serious physical condition, even if the parent "informs the court of his refusal to consent to the treatment." *Id.*

The trial court, in accordance with Section 6339(b), has ordered a second brain death evaluation. Although Father has expressed opposition to a second test, he has not raised any legal challenge the court's authority to do so. Therefore, there is no basis for this Court to disturb the trial court's ruling insofar as it authorizes the Medical Center to perform a confirmatory brain death evaluation. The Medical Center may proceed with the evaluation after notifying Father and Mother of the date and time of the evaluation, which both Father and Mother shall be permitted to observe.

However, Father was prevented by the trial court from questioning Medical Center personnel about removal of medical support or whether other options might be available in the event a second test confirms brain death. The court precluded Father from questioning in this regard despite the Medical Center's emergency petition that expressly requested relief that the court permit termination of life support if a second exam confirmed brain death. The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. And it has been a longstanding pronouncement that "[t]he fundamental

requisite of due process of law is the opportunity to be heard." ***Ford v. Wainwright***, 477 U.S. 399, 413 (1986) (citing ***Grannis v. Ordean***, 234 U.S. 385, 394 (1914)). Because Father was denied the opportunity to be heard with respect to "discussion of the family" or discontinuation of "ongoing medical care in accordance with the accepted medical standards," we vacate that part of the trial court's order.

In the event the second examination does not confirm brain death, the Medical Center would continue to provide medical care to M.A.P. However, should the examination confirm brain death, it would fall to the Medical Center to proceed in accordance with accepted medical standards. ***See*** 35 P.S. § 10203 ("A determination of death must be made in accordance with **accepted medical standards**") (emphasis added). The hospital's protocols, in accord with the American Academy of Pediatrics' Clinical Guidelines, call for discussion with the family, "so that parents and family members understand that their child has died. . . . It should be made clear that once death has occurred, continuation of medical therapies, including ventilator support, is no longer an option unless organ donation is planned." American Academy of Pediatrics' Clinical Guidelines, ***supra***, at e732.

In the event Father is present for the examination and the second examination confirms brain death, the Medical Center shall immediately engage Father in discussions regarding the results of the test and explain the Medical Center's protocols to terminate life support following confirmation of

brain death. The emergency stay currently in effect in accordance with the December 22, 2022 order—requiring the continuance of ongoing medical care for M.A.P.—shall continue in full force and effect until 5:00 p.m. on the seventh day after brain death is confirmed and a decision is made to terminate life support in accordance with accepted medical standards, in order to provide Father a brief window of opportunity to challenge the results of the second test and the decision to discontinue life support. In the event Father is not present for the examination, the Medical Center shall immediately contact counsel for Father or Father for discussion as outlined above, and the extension of the stay for seven days will commence, as stated, from the time the Medical Center informs Father's counsel or Father of the results of the second exam and the decision to terminate life support.[8] *See, e.g., Torres v. Texas Children's Hospital*, 611 S.W.3d 155, 162 (Tex.App.-Houston 14th Dist. 2020) (extending emergency order requiring continuation of life support for seven days for brain-dead child); *Fonseca v. Kaiser Permanente Medical Center Roseville*, 222 F.Supp.3d 850, 875 (E.D.Cal. 2016) (extending temporary restraining order requiring continued life support for

_____

[8] Mother agreed with the performance of a confirmatory brain death examination and did not challenge the Medical Center's intention to discontinue medical support following discussion with the family. However, if Mother is not present for the examination, the Medical Center shall also inform Mother, through her counsel, of the results of the examination and the Medical Center's intention to discontinue support upon the expiration of the emergency stay.

seven days for brain-dead child).[9]  In the event Father exercises his right within seven days to challenge the results of the second test and the Medical Center's decision to terminate life support, the stay ordered hereunder shall then also remain in effect until ordered otherwise by the trial court or this Court, as may be permitted by law, and unless so vacated, until a final order has been entered on the issue of continued life support.  If Father exercises his right to challenge the results of the second exam and/or the decision to terminate life support within the 7 days permitted hereunder, the trial court shall promptly schedule a hearing on the matter within 10 days of the filing of any such challenge.

Order affirmed in part and vacated in part.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/06/2023

---

[9] While we recognize that decisions of our sister states and lower federal courts are not binding on this Court, we may look to them for guidance and adopt their analysis as appropriate.  ***Commonwealth v. Arthur***, 62 A.3d 424, 429 n.9 (Pa. Super 2013) (citations omitted).