J. S06033/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| D.J.D., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  D.D., FATHER | : | No. 2648 EDA 2019 |

Appeal from the Decree Entered August 15, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-AP-0000195-2019

| | | |
|---|---|---|
| IN THE INTEREST OF:  D.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  D.D., FATHER | : | No. 2649 EDA 2019 |

Appeal from the Order Entered August 15, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-DP-0000021-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| G.M.D., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  D.D., FATHER | : | No. 2650 EDA 2019 |

Appeal from the Decree Entered August 15, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-AP-0000196-2019

| | | |
|---|---|---|
| IN THE INTEREST OF:  G.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  D.D., FATHER | : | No. 2651 EDA 2019 |

J. S06033/20

Appeal from the Order Entered August 15, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-DP-0000022-2018

BEFORE:  LAZARUS, J., McLAUGHLIN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED FEBRUARY 28, 2020**

In these consolidated appeals, D.D. ("Father") appeals from the August 15, 2019 decrees involuntarily terminating his parental rights to his minor children, D.J.D., male child born in August 2009 ("Child 1"), and G.M.D., male child born in January 2012 ("Child 2") (collectively, "Children"), under 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).  Father also appeals from the orders entered the same day that changed the Children's permanency goal from reunification to adoption pursuant to 42 Pa.C.S.A. § 6351.  We affirm.

At the outset, we note that Children's natural mother voluntarily terminated her parental rights to the Children on May 2, 2109.  (Notes of testimony, 8/15/19 at 5.)  Although natural mother is not a party to this appeal, the record reflects that the Philadelphia Department of Human Services, Children and Youth Division ("DHS") originally became involved with this family on September 24, 2017, when the Children were living with natural mother and her paramour.  DHS's involvement stemmed from allegations of natural mother neglecting the Children, selling drugs from the home, and illegally using drugs.  Prior to filing a dependency petition on January 2, 2018, DHS learned that Father was incarcerated.

With respect to Father, the trial court set forth the following:

On January 17, 2018, the trial court adjudicated Children based on present inability to provide proper parental care and control. Children were committed to the custody of DHS. DHS was ordered to make outreach to Father. Father was not present for this hearing.[Footnote 4] On February 28, 2018, Community Umbrella Agency ("CUA") held an initial Single Case Plan ("SCP") meeting. Father was incarcerated at the time of the SCP meeting.

[Footnote 4] Between January 17, 2018, and April 9, 2018, the trial judge assigned to this matter was the Honorable Lyris Younge. From June 29, 2018 to the present, this matter is assigned to the Honorable Joseph Fernandes.

A permanency review hearing was held for Children on June 29, 2018.[Footnote 5] Father was present for this hearing. The trial court determined that Father was moderately compliant with the permanency plan and that Father was on parole. The trial court ordered Children to remain as committed. The trial court referred Father to the Clinical Evaluation Unit ("CEU") for a forthwith drug screen, monitoring, and three random drug screens. Father was also ordered to sign releases and once Father obtained housing, CUA was to complete a home assessment and clearances. Father's visits were modified to include unsupervised visits with Children on Saturdays. Maternal Aunt was to schedule the time of pick up and return. CUA was ordered to supervise one of Children's visits with Father once per month.

[Footnote 5] A permanency review hearing was originally scheduled for April 9, 2019. The Juvenile Court Hearing Officer granted a continuance due to the appointment of new counsel for Father.

On August 17, 2018, CUA revised the SCP. Father did not attend this meeting. Children's alternate/

concurrent goal was identified as adoption. Father's parental objectives were to comply with court orders; provide verification of employment; comply with CEU recommendations and complete three random drug screens prior to the next court date; and attend visits with Children.

A permanency review hearing was held for Children on September 24, 2018. The trial court determined that Father was substantially compliant with the permanency plan. Father was re-referred to the CEU for a forthwith drug screen and three random drug screens. Father was ordered to provide verification of his employment to CUA and to comply with the Achieving Reunification Center ("ARC") referral. The trial court ordered Father to have liberal unsupervised visits with Children, as arranged by the parties, with one visit per month supervised by CUA. On September 27, 2018, Father tested positive for amphetamines at the CEU.

A permanency review hearing was held for Children on December 17, 2018. Father was not present for this hearing. The trial court determined that Father was incarcerated at [State Correctional Institute] Phoenix. CUA was ordered to make outreach to Father. The trial court ordered for Children to remain as placed.

A permanency review hearing was held for Children on February 13, 2019. Father was not present for this hearing due to Father's incarceration. The trial court ordered for Children to remain as placed with Maternal Aunt. The trial court referred Father to the CEU for an assessment, full drug and alcohol screen, dual diagnosis, and three random drug screens, once he availed himself. The trial court permitted Father to attend supervised visitation as arranged, when appropriate.

Child[ren] ha[ve] been adjudicated dependent since January 17, 2018. Father has been incarcerated on and off throughout the life of the case. DHS filed petitions to involuntarily terminate Father's parental

> rights and change Children's permanency goal from reunification to adoption on March 19, 2019.
>
> A permanency review hearing was held for Child[ren] on May 9, 2019. Father was present for this hearing. Father was referred to the CEU for a dual diagnosis assessment, a forthwith drug screen, and three random drug screens. Father was ordered to attend weekly supervised visits with Children. The visits were to be held at Children's discretion. The trial court continued the termination and goal change trial for Children due to Mother's decision to sign voluntary relinquishments of her parental rights.
>
> On August 15, 2019, the trial court held the termination and goal change trial for Children. Father was present for this hearing. Lawrence J. O'Connor, Jr., Esq., Children's special legal counsel ("Legal Counsel") was also present and made representations regarding Children's wishes. The trial court found clear and convincing evidence to change Children's permanency goal from reunification to adoption and to involuntarily terminate Father's parental rights under 23 Pa.C.S.A. §2511(a)(1), (2), and (b).

Trial court opinion, 10/29/19 at 3-5 (citation to notes of testimony omitted).

The record reflects that Father filed timely notices of appeal from the termination decrees and the goal-change orders, together with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Thereafter, the trial court filed one Rule 1925(a)(2)(ii) opinion in each termination and dependency docket for each of the Children.

Father raises the following issues for our review:

1.     Did the [trial] court err in finding that grounds for termination of parental rights had been proven by "clear and convincing evidence"?

2.     Did the [trial court] err in finding that [DHS] had met its burden in proving grounds under 23 Pa.C.S.A. §§ 2511(a)(1) and (2)?

3.     Did the [trial court] err in finding that DHS had met its burden to prove that termination would be in the [C]hildren's best interests, under § 2511(b)?

4.     Did the [trial court] err when it found that DHS by clear and convincing evidence had met its burden to change Children's goal to adoption?

Father's brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue."
*In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting
*Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

Here, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b).  We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).  Here, we analyze the trial court's termination decrees pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a)    General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2)    The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b)    Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

> income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services,

may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

With respect to incarcerated parents, in *In re Adoption of S.P.*, our supreme court held as follows:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(2). *See e.g. Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re:*] *E.A.P.*, [944 A.2d 79, 85 (Pa.Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d at 830-831.

Here, the trial court terminated Father's parental rights under Section 2511(a)(2) and thoroughly explained its reasoning for doing so as follows:

> Throughout the time that Children have been in the custody of DHS, Father's SCP objectives were to complete a dual diagnosis assessment and a drug and alcohol and mental health program, housing, provide proof of employment, attend the ARC for parenting, employment, and anger management, and visitation. Father has previously participated in [an] SCP meeting via telephone with CUA so he is aware of his objectives. Father was incarcerated from the time that the case was opened in December 2017 to April 2018. Father was then re-incarcerated between November 2018 and March 2019. Father failed to complete a dual diagnosis program or complete a dual diagnosis assessment. When CUA spoke with Father regarding his compliance with his dual diagnosis objective, Father indicated that he was "doing everything he needs to do." Father never provided CUA with any documentation regarding his dual diagnosis treatment or random drug screens. Although Father claims that he has completed multiple drug screens, there is no documentation that indicates that Father completed any drug screens since September 2018. On September 27, 2018, Father tested positive for amphetamines. Father also claims that he completed two drug programs while he was incarcerated and that he is currently active in an Alcoholics Anonymous ("AA") program, although Father did not provide any documentation confirming his completion or participation in any program. Father does not have appropriate housing for reunification with Children. Father previously indicated to the CUA worker that the home is in the process of being renovated. Father confirmed that the home is currently inappropriate for reunification.[1] Father

---

[1] The record reflects that at the time of the termination and goal-change hearing, Father was living with his mother. (Notes of testimony, 8/15/19 at 45-46.)

- 11 -

never provided documentation of his employment to CUA. Father has not completed parenting, employment, or housing at the ARC. Father was enrolled in parenting at the ARC, but was discharged on June 3, 2019, for non-participation after only attending one session. Father enrolled in parenting on August 8, 2019, and anger management on August 7, 2019, one week before the termination and goal change trial. Although Father indicated that he was enrolled in employment at the ARC, his first class did not begin until after the termination and goal change trial. Father claims that he completed a parenting program while he was incarcerated, but he did not complete a housing or anger management program. Father also indicated that the day after his release from prison in April 2019, Father was injured and was hospitalized in the intensive care unit ("ICU"). Father claimed that his injury delayed his ability to secure employment and housing, as well as cause issues in creating a schedule with the ARC. Father confirmed that he is not currently employed due to his ongoing injury. Father's visitation schedule is weekly, supervised at the agency. Father has struggled to maintain regular visits throughout the life of the case, especially after he was re-incarcerated in November 2018. Before Father was re-incarcerated, Father had graduated from supervised to unsupervised visitation, but Father's visits have since reverted back to supervised visitation. Father was consistent when visits were originally supervised in early 2018. When Father graduated to unsupervised visitation, Father became inconsistent. While Father was incarcerated between November 2018 and April 2019, Father's contact with Children was limited to telephone communication. Prior to the termination and goal change trial, Father missed the last three scheduled visits. CUA does not believe it would be appropriate to graduate beyond supervised visits at this time due to Children's reluctance to attend the visits with Father. Child 1 is not interested in attending visits with Father, and Child 2 is only sometimes interested in attending. CUA has indicated that although visits go well between Father and Child 2, Father will try to get information from Child 2

> regarding his current placement. Father has indicated that those concerns from CUA are untrue. Father has indicated that Child 1 has never attended a visit with Father. Father has only been minimally compliant with his SCP objectives and non-compliant in terms of his progress of alleviating the initial dependency concerns. Children need permanency and Father has demonstrated that he is unwilling to provide Children with essential parental care, control, or subsistence necessary for their physical and mental well-being. Father has refused to remedy the conditions and causes of Father's incapacity. Father is aware of his objectives. Father had ample opportunity to put himself in a position to parent. Father has been incarcerated on and off throughout the life of the case, which has created a strain on his relationship with Children. Father's repeated and continued incapacity has not been mitigated.

Trial court opinion, 10/29/19 at 9-11 (citations to notes of testimony omitted).

We have thoroughly reviewed the record in this case and conclude that it supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). The record demonstrates that the conditions that existed upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Father that caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. The record also supports the trial court's conclusion that Father continued to lack capacity to parent the Children.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, the trial court thoroughly explained its reasoning for terminating Father's parental rights under Section 2511(b) as follows:

> Although Child 2 has attended occasional visits with Father, Child 2 and Father do not have a parent-child relationship. Children would not suffer any irreparable harm if Father's parental rights were terminated and it is in Children's best interest to be adopted. Father has not participated in Children's medical care or school programs throughout the life of the case. Children are currently placed together in a pre-adoptive home with Maternal Aunt. Children look to Maternal Aunt for their day-to-day needs. In Maternal Aunt's home, Children do not have any issue

with academics or attendance at their elementary school. [The Children's guardian *ad litem* ("GAL")] met with Children in Maternal Aunt's home on May 8, 2019.[2] Child 1, a nine-year-old boy at the time of the termination and goal change trial, indicated to [the GAL] that he did not want any contact with Father. Child 2, a seven-year-old boy, indicated to [the GAL] that he did attend some visits with Father. When [the GAL] asked Child 2 if he wanted to continue visits with Father, Child 2 avoided the question. Child 2 appeared nervous when asked about his preferences. Both Children indicated that they wanted to be adopted by Maternal Aunt and remain in their "forever home." [The GAL] determined that Children were capable of understanding the concept of adoption. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Father. Children share a parental bond with Maternal Aunt, not Father. Child 1 has no bond with Father and has no desire to continue any contact with Father. Any bond or relationship of Father with Child 2 is attenuated since Father's visitation has been inconsistent throughout the life of the case. The DHS witness was credible.

Trial court opinion, 10/29/19 at 13.

Our thorough review of the record supports the trial court's determination that termination was proper under Section 2511(b).

---

[2] In its Rule 1925(a)(2)(ii) opinion, the trial court erroneously states that the Children's legal counsel met with the Children at maternal aunt's home on May 8, 2019. Our review of the record, however, demonstrates that it was the Children's GAL who visited them at maternal aunt's home on May 8, 2019. (Notes of testimony, 8/15/19 at 70.) The record further reflects that the GAL determined that no conflict existed between the Children's legal and best interests. (*Id.* at 70-72.) Even though no conflict existed, the Children were nevertheless represented by legal counsel who expressed her agreement that it is in the Children's best interest to involuntarily terminate Father's parental rights. (*Id.* at 72-73.)

Father also challenges the orders that changed the Children's goals from reunification to adoption. In dependency cases, our standard of review is as follows:

> [W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination as opposed to the findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re D.P.*, 972 A.2d 1221, 1225 (Pa.Super. 2009), quoting *In re C.M.*, 882 A.2d 507, 513 (Pa.Super. 2005). In considering a goal change, "the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." *Id.* at 1227 (citation omitted).

The trial court thoroughly explained its reasoning for entering the goal-change orders by first reiterating its findings with respect to its termination of Father's parental rights under Section 2511(a)(2) and adding that

> Child 1 has no relationship with Father. Father has indicated that Child 1 is angry with Father because Child 1 believes that Father broke his promise of staying in contact every day, due to his injury and

- 17 -

re-incarceration. Although Child 2 has attended occasional visits with Father, Child 2 and Father do not have a parent-child relationship. It is in Children's best interest to be adopted. Father has not participated in Children's medical care or school programs throughout the life of the case. Children are currently placed together in a pre-adoptive home with Maternal Aunt. Children look to Maternal Aunt for their day-to-day needs. In Maternal Aunt's home, Children do not have any issue with academics or attendance at their elementary school. The DHS witness was credible. The record established by clear and convincing evidence that the court's change of Children's permanency goal from reunification to adoption was proper. Children need permanency, which Father is unable to provide. Consequently, it is in Children's best interest to remain with Maternal Aunt in her home and to be freed for adoption.

Trial court opinion, 10/29/19 at 15-16.

After thoroughly reviewing the record, we conclude that it supports the trial court's factual findings and that the trial court applied the appropriate legal principles to the record when it entered the goal-change orders.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/20

- 18 -